May it please the Court, Darren Quinn for Plaintiff and Appellant, CollegeSource, Inc. Also present is Lead Counsel, William F. Woods. I shot an arrow into the air. It fell to earth. I know not where. That's a quote from Longfellow. In this case, the arrow hit the computer servers owned by CollegeSource in California. The harm to CollegeSource was in California. Is CollegeSource a California corporation? Yes, it is. Headquartered in California? Yes, it is. Okay. California Penal Code Section 502 is a criminal statute that protects CollegeSource from arrows, such as those fired by AcademyOne. Jurisdiction is proper. Did AcademyOne intend to shoot the arrow into California?  Did it know where the server was? Taking all inferences in CollegeSource's favor, the answer is yes. Did it know where the corporation is, both in the sense of principal place of business and where it's incorporated? Taking all inferences in favor of CollegeSource, yes, because it made phone calls to CollegeSource. It sent e-mails to CollegeSource. Okay. And then ultimately, most importantly, after this action was filed, we have wrongful conduct continuing against CollegeSource. Would you spell that out for me? When you say taking all the inferences, what inferences do we have to make to find purposeful availment or purposeful direction? Divide it into two parts. The easy part is this, is what happened after this action was filed. After this action was filed, we know that AcademyOne was using the digital information from CollegeSource on AcademyOne's website. In fact, something we're going to request judicial notice of is a NOVAC declaration filed in a sister federal court that shows if you went to the AcademyOne website in summer of this year and you went to the course database and you keyed in CollegeSource, CollegeSource's copyright information disclaimer came up. It was copied from CollegeSource's information. Number two, after this action was filed, AcademyOne was using CollegeSource's trademarks. So that makes a very easy case for jurisdiction based on conduct after the filing of the case. Now, how does that work? I mean, can you get jurisdiction based on post-filing conduct? Well, this would be because there's a first amendment complaint, there's an initial complaint, and then a first amendment complaint that added the trademark claims. I see. And you're talking about behavior between the filing of the two complaints? With respect to the trademark, that's going to be behavior that was discovered after the filing of the first complaint and then we alleged it in the first amendment complaint. With respect to what I just mentioned, with respect to the search that was conducted this summer, that would be after the first amendment complaint as well as after the reply briefs. So that's the easy part. If you want to look at before the initial complaint, taking all the inferences, the inferences would be AcademyOne contacted CollegeSource. Inferences, if you're going to call them by the phone, you know they're in California. AcademyOne sent an email to CollegeSource asking to license all the digital information. Again, the inference is they must have known about CollegeSource. Why does that follow from an email that they know they're aware about? So I understand the point about the phone, but why does it follow from an email that they know where they're located? Point well taken. Because you've got conversations going on. CollegeSource is the only competitor that had this database of information. So there's an inference that AcademyOne, as being in this industry, would have known about CollegeSource. But what you raise is an important point. The Facebook versus ConnectU case, if the court follows that, it doesn't matter whether they knew if CollegeSource was in California or not. All that matters is they knew that they were dealing with CollegeSource. That's the realities of the internet. Are you saying that if there was no personal jurisdiction on the day that the lawsuit was filed, just assume that? I know you don't concede that. But if that is so, but later on actions are taken that would otherwise provide a basis for personal jurisdiction, that that in effect relates back to the date of filing so that this court can determine there was jurisdiction or is jurisdiction, even though there was none at the commencement of litigation? Yes, that's what I'm saying. And then to make it easier for the court, if you recall, there was a cease and desist letter sent by CollegeSource before the action was filed. And AcademyOne acknowledges that it knew at least at that point that CollegeSource was in California. So because of that, because we have the wrongful conduct that's alleged in the complaint, in this case it won't be a difficult decision for this court to find, yes, they knew it was California. And the cease and desist letter was delivered before this action was filed? Yes, it was. And I noticed on it, the cease and desist letter, it said hand-delivered. Who hand-delivered it, or was it in fact hand-delivered? I mean, you guys are in California, they're in Pennsylvania. How does that work? My recollection, it was hand-delivered at a trade show by Carrie Cooper, who I believe was the... At some point she's the CEO. I don't know whether she was at that time. I believe that she was at that time. Certainly a high-ranking officer. And unless the court has further questions, I'd love to hear some. I do. But for purposes of finding, I mean, it sounds to me like you've abandoned any argument as to general jurisdiction. And for purposes of finding specific jurisdiction, don't we have to look at what Academy One knew or was doing at the time that it did the acts of downloading the catalogs in order to find purposeful development or purposeful direction? Because the development, well, that's a contract. You don't really have a contract, although you are relying on the terms a little bit. More for the tort of conversion. Don't we have to look at that framework, that time framework? You should. And I think that is a perfect example of the facts in the Tableau software versus any aspect case. In that particular case, the issue was, did the defendant know that it was copying the software? In this case, the analogy is, did Academy One know that they were copying the digitized data of CollegeSource? Which, of course, they did. It contains the terms of use right on the college catalogs. Then the second part of Tableau is, did defendant market that in the United States? In this case, Academy One marketed the digitized information in California. In fact, California is the largest of all the hits. It's over 2.1 million hits, 26,000 visitors, and that reaped them over 300 contracts between Academy One and California residents that we know of. The number is probably much greater because about half the people didn't designate where their state is. So if you look at Tableau, the focus of this court should be, for the realities of personal jurisdiction, is did Academy One copy CollegeSource's digitized information? Okay. You can save the rest of your time. Thank you. All right. Ms. Carrotnick. May it please the Court. I want to address a few of the points that Mr. Quinn made in support of CollegeSource's position. The first is that you cannot get jurisdiction after post-filing events, particularly where specific jurisdiction is at issue, which it is here. The test for specific jurisdiction in the Ninth Circuit is very clear, and it requires purposeful availment and a relationship between the act or conduct and the claims at issue. Here, there is no relationship between the act of conduct and the claims at issue in the conduct that took place prior to the filing of this complaint. With respect to the AdWords, which Mr. Quinn raises, the AdWords were purchased, and there is uncontroverted testimony on this fact during jurisdictional discovery, and in the record below, there is uncontroverted testimony that the AdWords were purchased before the filing of the complaint. Although they may have been used on an ongoing basis, they were purchased by a third-party vendor, Internet companies such as Google and Yahoo, and that was done before the complaint was filed here. Ms. Kretnik, can I ask you this? Is it your contention that at the time the CollegeSource materials were downloaded by people working for you, that your company did not know where CollegeSource was located? It is our contention that at the time that the materials were downloaded by a third-party contractor in China, Academy One did not know where CollegeSource was located. How, then, do you account for the email sent by Peggy Munkitrick in December of 2005 to somebody named Ralph... I got to Anders, who was then the president of CollegeSource, trying to set up a conference call. Now, to set up a conference call, you ordinarily want to know what time zone the person is in, and in order to know what place somebody's time zone is, you usually say, well, I'm in California, I'm three hours different, and you guys, your clients are in Pennsylvania. I don't know how, if you're setting up a conference call, Ms. Munkitrick of your company doesn't know the CollegeSource is in California. Ms. Munkitrick, at the time, in 2005, when those demo members said there was some interaction between limited email and telephone interaction between CollegeSource and Academy One, did not know that CollegeSource was located in California, and I believe... Let me stop you right there. Are you denying that she sets up a conference call with CollegeSource in December 2005? There was... It is my understanding, based on the record, that there is no evidence that the conference call ever took place. There was no email communication, but no transaction or formal discussion ever had about the acquisition of the electronic data that's at issue here. Okay, so let me just read to you the email I have in mind. It's on ER 199. It's to Ralph from Peggy. The third paragraph says, Anyway, I assume you've had a chance to talk to Annette and to Carrie in order to determine whether further conversations are warranted. In other words, they've been talking along, so they're kind of current. And then Ms. Munkitrick writes, Thanks for your time. We look forward to talking to you. And are you telling us that that conference call never took place and they never even talked about whether or not they would have the conference call in order to determine time zones? It's my understanding that it didn't. And what do you have in the record on which you base your understanding? Well, there is the testimony of David Moldoff and others who say, that while there were some overtures made and discussions had about the possibility of the acquisition of data, nothing was ever consummated. That doesn't go to the question we're talking about, which is to say this conference call. There is nothing in the record to say that the conference call itself, in particular the one referenced in ER 199, did not take place. There's also nothing to suggest that it did. And what are we supposed to do with an email that talks about setting one up, when the obvious inference is that if you're setting one up, one of the things you do is figure out where the other party is located. Who gets the benefit of the inferences? In a situation in which evidence is uncontroverted at this stage, that is upon initial motion, the inference, if it's an application in the complaint or evidence presented by the plaintiff appellant, the inference goes to them. I acknowledge that. But where the evidence is controverted, the inference does not automatically go to them. In this case, there is testimony above and beyond the ER 199 that says that Academy 1, at the time that the events giving rise to the claims in this case purportedly happened, did not know or have any awareness of College Source's location in California. The email to which you point, predates by a significant amount of time the events giving rise to the claims in this case, which is the basis on which specific jurisdiction here purportedly rests. But the question in part is, at the time giving rise to the causes of action, what did your client know? And the fact that this email predates those actions suggests, then, that your client knew as of the time of the email, which means that they knew thereafter. I respectfully disagree, and I think a factor here that's not being discussed is that there was a third-party vendor in China who was involved in retrieving the data. That third-party vendor in China was tasked, there's unrebutted testimony on this point, was tasked with going to websites, websites that were tied to and directly linked to schools to obtain their college catalogs. That third-party vendor could not have known of College Source's location in California, and if it did, it's not clear that that knowledge should be imputed to Academy 1 either. Let me back up for a moment. I remember in the record that Mr. Moldoff testified that he had some exploratory phone calls with College Source back in, I think, 2005. Yes. So it isn't just this theoretical conference call. There were actually phone calls. Now, if there are phone calls, why doesn't the inference that that would tell a person, i.e., Academy 1, where College Source was located, because they had a telephone call, which would require the dialing of a telephone number that I think we can infer, would establish a location? I'm not sure that we can infer that. There's also been no evidence of record that that was a number directly tied to California, as opposed to, say, an 800 number. But even assuming that Mr. Moldoff in 2005 understood that he was calling College Source, he may not have recognized the area code as that being one from California. Well, I think you're suggesting that one can render oneself completely ignorant, not look, not pay attention, not divine the area code, and just not have knowledge by not taking any diligent steps to figure it out. Is that correct, that in the modern world, that one can just render oneself ignorant, even though the information is easily accessible? No, it is not correct that one can render oneself ignorant, and I don't believe that that's what happened here, although one of the College Source points to two cases, Tableau and Facebook, and they rely heavily on those two cases. And both of those cases suggest that if you don't know the precise location of the plaintiff, there is something more required before you can be hailed into the jurisdiction of a foreign plaintiff. And the something more is some form of intentional aiming. Here, there is absolutely no evidence of any form of intentional aiming that goes above and beyond perhaps some imputed knowledge on the basis of a single phone call or series of phone calls. There is nothing to suggest that Academy Wine intentionally aimed its conduct at College Source. Yes. Is there anything from which it could be inferred that Academy Wine knew at some time prior to the filing of this lawsuit that College Source materials had been downloaded by the Chinese contractors? No. That is to say, you're telling me that all several hundred of the materials, documents that were downloaded, you guys never looked at? Because they say right on them, College Source. Right. Some of them, they do say College Source. And because they say College Source, it seems to me fairly likely that your client, after they've been downloaded by the Chinese contractors, would have looked at them. I want to correct an answer that I just gave you. You asked if any time prior to the filing of this lawsuit, Academy Wine had any reason to know. And I said no. The answer is actually yes. Upon receiving the cease and desist letter, it certainly had reason to know. And that was prior to the filing of this lawsuit. And did they have any reason? Is there any reason to think they might have known that there were College Source materials downloaded? We just lost. Oh, there we are back again. Downloaded before the cease and desist letter. Does it say they clearly your client clearly has them? And are we supposed to infer that your client doesn't look at what it has? There were literally hundreds of thousands of PDF catalogs that were put up on Academy One's website in a particular database, which is the database at issue. Among them, some 680 were related purportedly related to College Source. And why do you say and why do you add the word purportedly? Well, were they weren't they weren't isn't that isn't that undisputed that these were College Source materials? It is undisputed that there were some College Source materials on the website, totally 680. It is an allegation in the complaint, I guess, for purposes of this argument, we can say 680. But there is no evidence of record. And in fact, it's our client has testified that the it had no knowledge that those materials were posted in its in its database and that those materials were connected to or for the College Source mark until it was notified by way of a cease and desist letter. All right. Thank you, counsel. Thank you. I believe you have got a minute left. I show I've got a minute remaining. Counsel had mentioned that an Internet website is not enough. You need something more. And then the court had asked the question whether or not we were abandoning the issue of general jurisdiction. And College Source is not abandoning general jurisdiction. We think that that is a basis that the court can find. We think the easier way for the court to find is specific jurisdiction. But we hold by the 10 points set forth in our opening brief on pages 62 and 63, showing the Web site in the something more. I appreciate the time zone inference. I think that is an inference that certainly goes to College Source's favor. But the last point I'd like to make is at this point, there really are only two competitors in this national market. And there's an inference that can go to College Source that Academy One knows who the other competitor is. Unless you have further questions, I'm concluding my time. All right. Thank you, counsel. College Source versus Academy One is submitted. Next case, Enya versus Holder is submitted on the briefs. We'll take up the Conan versus Holder.
judges: Lynn, Wardlaw, Fletcher W.